[Cite as *State v. Curtiss*, 2022-Ohio-146.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29006 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-1088 |
| | : | |
| TEAVEN CURTISS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of January, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by J. JOSHUA RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ERIC G. ECKES, Atty. Reg. No. 0091840 and STEPHANIE F. KESSLER, Atty. Reg. No. 0092338, 455 Delta Avenue, Suite 105, Cincinnati, Ohio 45226
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Teaven Curtiss, appeals from his conviction on one count of rape of a child under ten years of age and one count of gross sexual imposition of a person less than thirteen years of age. In support of his appeal, Curtiss presents ten assignments of error. For the reasons discussed below, we find that the first and second assignments of error have merit and they are sustained. The second, third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error are overruled, and the tenth assignment of error is overruled as moot. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded for further proceedings.

I. Facts and Course of Proceedings

{¶ 2} On June 24, 2020, Curtiss was indicted on one count of rape of a person less than ten years of age, a first-degree felony, and one count of gross sexual imposition of a person less than 13 years of age, a third-degree felony. The acts in question were alleged to have occurred between November 3, 2017, and October 30, 2018.

{¶ 3} Curtiss was arraigned on July 7, 2020, and pled not guilty to the charges. Bond was set in the amount of $500,000 cash surety, plus electronic home detention. After a bond hearing on July 16, 2020, the court continued the bond as before. Transcript of Proceedings, Vol. I ("Tr."), p. 40. On July 24, 2020, Curtiss posted bond and was ordered released from jail. Subsequently, on July 27, 2020, Curtiss filed a motion requesting an order for an in-camera review of records from Montgomery County Children Services ("MCCS") involving two children, "Kevin," born in 2012, and "Kathy," born in

2013.[1]   On August 7, 2020, the court ordered an in camera review.   The court then filed Court's Ex. I (a compact disc containing a complete copy of the MCCS file) under seal on September 2, 2020.   Also filed under seal on the same day was Court's Ex. II, a printout of the records the court found relevant and discoverable and which were provided to defense counsel.

{¶ 4} On September 25, 2020, Curtiss filed a motion to suppress, which was ultimately heard on November 12 and 18, 2020.   In the meantime, on September 29, 2020, the State filed a notice of an intent to introduce child statement evidence pursuant to Evid.R. 807 and a request for a hearing.   This was with regard to Kathy's statements.   However, before the November 12, 2020 hearing, the court interviewed Kathy and determined that she was competent to testify.   Tr. at p. 53.   However, the court overruled the suppression motion, based on a finding that the search was constitutional. *Id.* at p. 121.

{¶ 5} On November 23, 2020, the State filed a motion asking the court to review further MCCS records in camera and to release additional information to the defense, based on what had occurred during the November hearings.   The State noted that Kathy's mother ("Mother") had said during the hearing that her children had been removed due to a domestic violence incident involving Mother's ex-boyfriend.   As a result, according to the State, the "circumstances surrounding the removal are now at issue and may be relevant at trial."   Motion for Court to Review In Camera Children's Services Records (November 23, 2020), p. 2.

---

[1] We will refer to these children as Kevin and Kathy, which are not their real names.   The children are siblings.

{¶ 6} The trial court did not file a written decision on this motion prior to trial, which began on December 7, 2020, but it did indicate during the final pretrial hearing on December 1, 2020, that defense counsel would be provided with some additional pages of MCCS records.  Tr. 1 at p. 124.  The court also filed and sealed those records as Court's Ex. I and II on December 17, 2020.  *Id.* at p. 125.

{¶ 7} In the meantime, on December 3, 2020, the State filed a motion in limine seeking to prohibit Curtiss from introducing any evidence or testimony pertaining to Kathy's other disclosures of sexual abuse.  The disclosures in question involved Curtiss's son, J.C., who had been adjudicated a juvenile sex offender against a child in another county and was living with Curtiss when Kathy was in the home.

{¶ 8} The same day, the State filed another motion in limine asking the court to prohibit the defense from introducing any evidence relating to a caseworker's opinion that Kathy's brother, Kevin, had been coached to make disclosures.  Subsequently, Curtiss filed a motion in limine on December 6, 2020, asking the court to preclude any testimony relating to statements that Kevin made, because the State was not calling him as a witness at trial.

{¶ 9} After jury selection, the court sustained the State's motion to prohibit evidence of other disclosures of sexual abuse.  Tr. at p. 296-297.  With respect to Kevin's testimony, the court agreed with the defense that Evid.R. 807 did not apply because Kevin was not the victim in the case.  However, the court deferred ruling on other bases for admission of Kevin's testimony that the State might argue.  *Id.* at p. 298-299.  Finally, the court agreed with the State that the caseworker would not be permitted to give an expert opinion on coaching.  *Id.* at p. 299.

{¶ 10} During trial, the court then decided, over the defense objection, to allow Kevin's forensic interview to be played, even though Kevin had not been called to testify. Tr. at p. 636-637. Ultimately, after hearing the evidence, the jury found Curtiss guilty on both charges. The court then sentenced Curtiss to life in prison without the possibility of parole on the rape charge and to a 60-month sentence for gross sexual imposition, to be served consecutively. Following the judgment, Curtiss filed a timely appeal, and he has raised ten assignments of error.

## II. Failure to Disclose Records

{¶ 11} Curtiss's first assignment of error states that:

The Trial Court Erred When It Failed to Disclose Relevant MCCS Records in Violation of Curtiss's Right to Due Process and a Fair Trial.

{¶ 12} Under this assignment of error, Curtiss argues that the trial court erred in failing to disclose material records from MCCS that would have changed the outcome of this case. The records in question were contained in two sets of documents both marked as Court Ex. I, which the court reviewed in camera. The first Court's Ex. I, filed under seal on September 2, 2020, was a compact disc containing 124 separate records. It consisted of hundreds of pages of MCCS records, including an MCCS activity log from October 13, 2018, to February 2, 2020. The documents released to Curtiss were contained in Court's Ex. II, filed under seal on September 2, 2020.

{¶ 13} The second Court's Ex. I, filed on December 17, 2020, contains an MCCS activity log from May 11, 2017, to August 2, 2017. The second Court's Ex. II contains redacted records from this Ex. I, and was filed under seal on December 17, 2020.

{¶ 14} All of these records were reviewed for purposes of deciding Curtiss's appeal. In view of this review, a discussion of some further factual background of the case is appropriate.

## A. Factual Background

{¶ 15} The alleged victim, Kathy, was born in September 2013, and her brother, Kevin, was born in June 2012. Mother also had two other children: a daughter Laura, who was born in April 2017, and a son, David, who was born in December 2018. Tr. at p. 380.[2] K.C. was Kathy and Kevin's father, and another man, D.H., was the father of the two younger children. *Id.* at p. 382.

{¶ 16} K.C. was not involved with Kathy and Kevin, but his father, Teaven Curtiss, became involved in their lives when Kathy was two or three years old. *Id.* at p. 384. After Curtiss became involved, Kathy and Kevin stayed every other weekend at the home of Curtiss and his wife, T.C. *Id.* at p. 386 and 823. Other grandchildren came to stay at the house as well, and Curtiss and T.C. took them to parks, to the pool, and to eat. They also played with them, watched movies, and celebrated special occasions like birthdays, Christmas, and Easter. *Id.* at p. 822 and 853.

{¶ 17} Beginning in January 2017, MCCS investigated Mother's family for concerns of physical abuse. *Id.* at p. 429. After MCCS became involved, the three children were still living with Mother, pursuant to a safety plan. *Id.* at 424. At the time, Mother was romantically involved with D.H., who, as noted, was Laura's father.

{¶ 18} According to Mother, a domestic violence situation occurred with D.H., in

---

[2] Again, these are not the children's real names.

which Mother was the victim. As a result, her children were taken away from her and placed in foster care. Mother also stated that there were no incidents of domestic violence between her and D.H. before the children were removed. *Id.* at 422-423. In addition, Mother said that abuse of the children was not involved; instead, the physical abuse was between Mother and D.H., and they just had one domestic violence incident. *Id.* at 382 and 426.[3]

{¶ 19} After being removed from Mother's home on August 10, 2017, Kathy and Laura were placed in foster care until November 2017. Tr. at p. 383, 424, and 823. At that point, Kathy went to live with Curtiss and T.C., and Laura went to live with Mother's

---

[3] These facts, testified to by Mother, were inconsistent with the records. According to the records in Court's Ex. II (Sept. 2, 2020), MCCS became involved with Mother and her children in January 2017, well before the children were taken from Mother's care on August 10, 2017. Activity Log, p. 70-71. This involvement was due to concerns about D.H.'s physical abuse of Kevin and ongoing violence in the home around the children. *Id.* Mother also admitted to MCCS that *many* instances of domestic violence had gone unreported. (Emphasis added.) Amended Case Plan, p. 3.

After MCCS became involved in January 2017, a safety plan was put into effect and the children were allowed to remain with Mother. However, the children were then removed from Mother's care on August 10, 2017, for several reasons, including a domestic violence incident that occurred in Mother's home on July 21, 2017, between Mother and D.H., Mother's failure to cooperate and her indication that she did not need help, and substantiated emotional maltreatment of the children. *Id.* S*ee also* Safety Assessment, p. 3; Family Assessment, p. 3; August 25, 2017 Diagnostic Assessment for Kevin at St. Joseph's Orphanage ("Diagnostic Assessment"), p. 2-3; and Activity Log, p. 33 and 40.

After the children were removed, there were also substantiated emotional maltreatment and neglect allegations against Mother in February 2018, based on the fact that she pulled a knife on the children's grandmother. This was in front of the children. Family Assessment, p. 3; and Amended Case Plan, p. 3. Furthermore, during the pendency of the criminal case, i.e., *before Mother testified*, Mother's physical abuse against Kevin was substantiated for the dates of April 16 and 26, 2019. *Id.*; Activity Log, p. 156-157; Alleged Perp. Letters; and High Risk Abuse Confirmation, p. 2-4. Due to Mother's failure to cooperate with the investigation, in May 2019 MCCS filed for protective supervision of the children, which the Juvenile Court granted on June 17, 2019. Activity Log at p. 95, 103, 117, and 119-120.

father and step-mother.   *Id.*   According to Mother, Kevin was placed in an orphanage until December 15, 2017, when he went to Curtiss's house.   *Id.* at p. 427.[4]   In December 2017, Mother gave birth to her fourth child, David, whose father, D.H., had been involved in the domestic violence incident that occurred in July 2017.

{¶ 20} After the children were removed, Mother was given visitation once a week. Initially, visitation was at the children services agency.   Over time, as Mother worked her case plan, the visits were supposed to increase.   Eventually, Mother was able to have visits with Kevin and Kathy at her home, and in late July 2018, she had her first overnight visit with the children at her home.   Tr. at p. 389.   Mother got the children late Saturday evening and was supposed to take them back to Curtiss's house on Sunday evening around 6:00.   *Id.* at p. 389-390.

{¶ 21} Mother testified that she bathed Kevin and Kathy separately in preparation for returning them to Curtiss.   While she was drying Kathy off, she noticed blood dripping down Kathy's inner thigh.   It was sufficient to leave a nickel or quarter-sized pool of blood on the floor.   *Id.* at p. 390.   Once Mother calmed Kathy down, she was able to see that the blood was coming from Kathy's vagina.   Mother asked Kathy what had happened, but Kathy was "screaming and hollering" like she was in pain.   *Id.* at p. 391-392.

{¶ 22} When Mother was looking for the source of the blood, she tried to get Kathy

---

[4] Contrary to Mother's statement, Kevin was displaced from two foster homes and was admitted to Dayton Children's Hospital ("DCH") from August 10 to August 25, 2017.   At that point, Kevin was transferred to St. Joseph's Orphanage for psychiatric stabilization. He stayed there until January 2, 2018.   Diagnostic Assessment, p. 1, and Discharge Summary, p. 1. Kevin then was released to Curtiss's home. Kevin was displaced from the foster homes and taken to DCH for "aggression, verbal threats, biting, and agitation. While in DCH, Kevin attacked several staff members, tried to run from the hospital, and engaged in physical destruction.   The assessment summary also noted that Kevin "had been displaced from over 15 daycares" for similar behavior. Diagnostic Assessment, p. 7.

to lie down, but it was a struggle. Kathy was not willing to open her legs and was screaming and crying. It was not like Kathy to act like that, as Mother had never had any problems with Kathy. *Id.* at p. 392.[5] When Mother asked Kathy about it, Kathy did not want to talk. However, Kevin was standing at the bedroom door and could hear what was going on. Kevin was kind of screaming and yelling, just as Kathy was, and said "Pawpaw Teaven did that; Pawpaw Teaven did that," and kept repeating it. *Id.* at p. 393-394. At that point, Kathy stated that they were not supposed to talk about that, because they would get in trouble. *Id.* at p. 394. Kathy still did not want to talk about it, but the next day, she told Mother that Curtiss had been touching her. *Id.* at p. 395.

{¶ 23} After learning the above information, Mother decided not to return the children to Curtiss that night. She also called her MCCS caseworker, Lisa Brown, but was unable to reach her. As a result, she left Brown a voice mail. Mother also called

---

[5] This was inconsistent with the records, as was Mother's statement that she never had any problems with Kathy before the sexual abuse, but had problems afterward with Kathy at school, daycare, and at home. Tr. at p. 410. Mother also inaccurately stated that she did not have any behavioral issues with Kathy in 2017. *Id.* at p. 457. In contrast, before the children were removed from Mother, Kathy was reported to have been aggressive toward Kevin and Laura. Amended Case Plan, p. 3. The same report also noted that Kathy had "been exposed to repeated trauma incidents as a result of her mother's explosive behaviors as well as her exposure to trauma through maternal relative and romantic relationship interactions." *Id.* Furthermore, on July 26, 2017, Mother reported that she was "having all kinds of problems with the kids including * * * [Kevin and Kathy] acting out." Activity Log, p. 38. Mother's stepmother, who babysat for the children at times, stated that before the children were removed in 2017, Kathy had behavior issues, including defiance, hyperactivity, and trouble listening and following directions. Tr. at p. 547. Finally, a report on a family conference with Mother held on August 4, 2017, indicated that Kathy had "speech and behavior issues." Activity Log, p. 40.

Kathy's progress report for the first quarter of preschool in 2017 (after the children had been removed from Mother) noted that Kathy "needs redirection many times throughout the day. We have seen some improvement with having her comply with the teacher's requests and fewer outbursts. Until this last week (October 16)." MCCS Grade Card.

her mother and stepmother and told them about what had happened. Tr. at p. 397. Because Mother had a pediatrician's appointment already scheduled for Kevin the next day, she took Kathy along to have her checked out. *Id.*[6]

{¶ 24} During the visit with the pediatrician, Dr. Parks, Mother did not tell the doctor what Kathy had told her. *Id.* at p. 399. According to Mother, she did not tell Dr. Parks about this because she did not have custody of the children and was not supposed to take them to the doctor.[7]

{¶ 25} Dr. Parks, a general community pediatrician, testified at trial. Dr. Parks stated that she had been treating Kathy since 2016. *Id.* at p. 470-471. On July 25, 2018, Kevin had an appointment with Dr. Parks about his medication. *Id.* at p. 471. At the end of the visit, Mother told Dr. Parks that Kathy had been scratching her privates, and asked her to take a look. *Id.* at p. 471-472. In such situations, Dr. Parks' normal procedure is to have a parent undress the child, and she then does a visual of the genitals; that is what occurred during this visit. *Id.* at p. 474.

{¶ 26} Mother did not disclose to Dr. Parks that she had any concern about sexual abuse. *Id.* Kathy was a bit combative and did not cooperate with getting undressed. *Id.* at p. 475. After Mother undressed Kathy, Dr. Parks took a visual look at the exterior genitalia; she did not use any instruments. *Id.* Dr. Parks observed some abrasions, some skin breakdown on the inner part of the vulva on the inside of the labia minora. *Id.*

---

[6] There is a discrepancy in the timeline here, as Mother stated that the bath occurred on Sunday, July 22, 2018. However, the visit with the pediatrician took place on Wednesday, July 25, 2018. Tr. at p. 389, 445, and 472.

[7] However, Mother told her caseworker on the very day of the appointment that she had taken the children to the doctor. Tr. at p. 400-401 and 443.

at p. 476. Dr. Parks did not recall anything being on the external part of the labia and did not see anything on the inner thigh area. *Id.* There were no signs of bleeding. *Id.* at 784.

{¶ 27} Because Dr. Parks did not have any idea that there was a sexual assault allegation, she did not do anything further or refer Mother anywhere. *Id.* at p. 477. Dr. Parks told Mother that the condition can be normal and told her to apply some Vaseline on the area so the skin could heal. *Id.* According to Dr. Parks, this kind of skin breakdown can be caused by a number of things, including girls' nails scratching, inserting foreign objects at bath time to play, a lot of wiping or not wiping adequately after potty training, and someone else touching or putting objects in there. *Id.* at p. 478. Mother thought one of the causes might be a yeast infection, because Kathy was scratching. *Id.* at p. 493. If Dr. Parks had known potential sexual abuse were involved, she would not have conducted the examination and would have referred the child to CARE House. *Id.*

{¶ 28} On July 25, 2018 (the day of the exam), Mother sent an email to Lisa Brown, her caseworker, at 6:51 p.m. Tr. at p. 401. This email stated that:

> Hello, I called and left a message for you regarding [Kathy] and [Kevin]. I took them to the doctor appointment yesterday for [Kevin's] med checkup, which Dr. Parks was very upset due to the fact that [Kevin] has not been being given his medication. So she did order labs and such for me to take him to get done.
>
> And when I had [Kathy], she decided to tell me that her private area was bleeding, so I looked, and it was. She told me Pappaw Teaven

touched her there, and that Pappaw told her that is only used to play with. I'm not sure what is going on, but * * * wanted to get it looked into. She is just very detailed for her age on her private area and has a very detailed story when it comes to talking about it.

I did ask Dr. Parks about it yesterday, and * * * she said it looks like it has possibly been rubbed on too hard due to the way it looks and * * * how it looks, and how the bleeding is my biggest concern is the safety of her obviously, and to make sure she's not being touched inappropriately by anybody.

If you could give me a call as soon as possible about this matter, I would greatly appreciate it. I was advised to call the 224-KIDS number * * * and let them know, but I am messaging you, and did leave you a voicemail yesterday as well, so I'm hoping to hear from you by tomorrow. If not, then I guess I will call the hotline and discuss with them.

Also, when I was at court today for child support for their father, I was advised by the Magistrate to file for emergency custody due to neglect on [Kevin's] medication, and now the situation with [Kathy].

I also asked downstairs if you guys had filed anything to get an earlier court date, and they said you have not, so that is the – why their recommendation to file for emergency custody, I believe, is what she said it was called. Thank you."

Tr. at p. 401-402 and State's Ex. 3.

{¶ 29} Later in the email, Mother said that if she did not hear from Brown the

following day (July 26), she was going to call 224-KIDS. *Id.* at p. 451. Mother did not call the hotline on that date. At trial, Mother said that she eventually did call and spoke with the "FAIR" program. *Id.* at p. 452. According to Mother, she did not get anywhere with her caseworker, the FAIR people, and her caseworker's supervisor with respect to this situation as well as other issues. *Id.*

{¶ 30} Mother also stated that Brown never responded to her email. *Id.* at p. 402. However, the following day, on July 26, 2018, Brown called Dr. Parks, who would have told her that there had been no discussion with Mother about any type of sexual abuse. *Id.* at p. 481 and 495. At trial, Mother also indicated that she did speak with Brown about the sexual abuse incident and that Brown spoke with the children as well. *Id.* at 454.

{¶ 31} One of the documents disclosed to the defense after an in camera review was a report of Brown's supervisor, Michelle Williams, concerning a home visit with Mother on January 14, 2019. *See* Activity Log, p. 44-46. This report stated, in pertinent part, as follows:

> [Mother] reported that she thinks after about 20 sessions [of Kathy with a counselor], the detective will have the information he needs to be able to file charges against Teaven. * * * [Mother] stated that the detective is mad because the kids had visits with Teaven after the original allegations. I inquired of [Mother] and asked her if she remembered talking to Mgr MJ Johnson after she sent the email to CW [Brown] * * *. [Mother] stated, "yes, the one who is retired now." I informed her that Mgr MJ Johnson is now retired. I asked [Mother] if she remembered her conversation with Mgr Johnson who talked to me about their allegations after I returned from

vacation and it was reported that she [Mother] denied having any concerns regarding the children being sexually abused by Teaven. At that time, it was reported to me that [Mother] thought the doctor had concerns, but when speaking with the doctor – nothing was ever stated to her about any concerns of sexual abuse and the doctor did not have any concerns regarding sexual abuse because it was not stated to her and she did not have any reason to be examining or questioning [Kathy] about this. [Mother] stated that she does remember this conversation and how it could be assumed that we did not have concerns. I informed [Mother] that it was reported that you talked about Teaven putting the cream/Vaseline on [Kathy] because of her scratching and she knew about this and was not concerned that it might be sexual abuse. [Mother] also acknowledged this and she stated that [Kevin] did watch Teaven put the cream on [Kathy] and she wanted to know why [Kevin] would be watching this and stated that this is gross. I informed [Mother] that I cannot guess why [Kevin] would be watching but when statements are made about sexual abuse - and then allegations appeared to have been denied is why I was told that a referral was not needed at that time. It did not appear that anyone had concerns in July and [Mother] acknowledged this but stated the detective stated that a referral should have been made. I informed [Mother] that we have to go forward with the information we have at this time and with the referral being made in October - the agency filed to suspend visits with Teaven and that I do not believe he will fight this in any way and the court hearing should be

straight forward. [Mother] wanted to know if the agency could end involvement at that time. I informed [Mother] that we can request this since PSUP [protective supervision] expires at the end of March anyway. * * * I reminded [Mother] of the concerns that got the agency involved initially and she stated that she is trying to keep [D.H.] away so that the children are not exposed to violence.

Activity Log, p. 44-45.[8]

{¶ 32} In any event, the matter was not referred to CARE House (which handles child abuse issues) after the July 2018 allegations, and Mother returned the children to Curtiss's custody.

{¶ 33} In mid-August 2018, Laura returned to Mother's home, and Kevin and Kathy returned home on August 25, 2018. Tr. at p. 404. A hearing on returning custody to Mother was held on September 28, 2018, and Mother was given custody of the children, with MCCS retaining protective supervision. In addition, the court gave Curtiss visitation time on alternating weekends. *Id.* at p. 404 and 458.

{¶ 34} Despite appearing in court on September 28, 2018, where she was represented by counsel (and despite the fact that Curtiss and his wife were no longer living together), Mother did not mention the sexual abuse allegations during the court proceedings. *Id.* at p. 458-459.

{¶ 35} After the children were returned to Mother, Kathy attended a preschool and

---

[8] As noted, after the case was closed, the agency became involved again a very short time later, based on allegations that Mother had physically abused Kevin. The allegations were substantiated, and the agency was again given protective supervision due to Mother's failure to cooperate.

kindergarten school in West Carrollton, where Mother was then living. At the beginning of the school year in 2018, Kathy was referred to a mental health therapist, Sarah, due to some behavioral issues. Tr. at p. 354. Sarah's normal procedure was to observe the child in the classroom, call the parents to explain her services, and then for them to come in for an assessment. Id. at p. 356. During the intake interview with Mother, Sarah learned about the sexual abuse Kathy had reported. She then made a mandated report to the hotline, 224-KIDS. Id. at p. 358-359. Detective Spears subsequently contacted Sarah and said an investigation would be conducted. Id. at p. 359.

{¶ 36} Melissa Lowe, an MCCS employee working at CARE House as a child welfare intake worker, received a sexual abuse referral on October 12, 2018. Id. at p. 609-610. This was about two weeks after Mother had received custody of the children. Melissa reviewed the file and noted that an allegation had previously been made to Mother's caseworker. Melissa also spoke with Mother and arranged a forensic interview at CARE House. Id. at p. 614-615.

{¶ 37} During Kathy's forensic interview on October 30, 2018, Kathy disclosed that Curtis had touched the middle part of her "coco" (Kathy's name for her vagina), and had told her that he was the only one who could touch it. Id. at p. 651. Kathy further stated that Curtiss had touched her coco with his hand and had used something else to touch it. Id. at p. 652. Kathy described the object as the "blue thing and the white thing" and said it was "like a stick." Id. at p. 656-657. She further described the object as having "three fingers down and one up." Id. at 675. In addition, Kathy stated that when Curtiss touched her coco, it hurt and it bled. Id. at p. 662.

{¶ 38} On October 30, 2018, a forensic interview of Kevin was also conducted at

CARE House. During the interview, Kevin stated that he had seen Curtiss touch Kathy's coco hard with his hand and make it bleed. He further said that he had seen this more than once. Tr. at p. 690 and 693.[9]

{¶ 39} On the same day as the interview, a pediatric nurse practitioner who specializes in child abuse examined Kathy. The examination was normal, but Kathy stated during it that Curtiss had touched her coco with his fingers and stuff, and that it hurt. *Id.* at p. 711, 715, and 718.

{¶ 40} After the forensic interviews, Det. Spears obtained releases for Kathy's records with Dr. Parks and the school therapist. *Id.* at p. 725 and 732-733. Spears worked at CARE House as a detective. *Id.* at p. 725. Spears also spoke with Brown regarding her failure to pursue a forensic interview and testified that her reasons did not make much sense to him. *Id.* at p. 730.

{¶ 41} On November 20, 2018, Spears learned that Curtiss was still receiving visitation with the children, told Mother not to allow it despite the existence of a court order, and contacted prosecutors to file paperwork to end visitation. *Id.* at p. 733-734 and 761. Subsequently, on December 6, 2018, Spears executed a search warrant on a

---

[9] Records not disclosed after the in-camera inspection indicate that during an MCCS investigation of Mother's physical abuse in 2019, Kevin was asked if he ever lied. Kevin "hid his face in his shirt and then stated 'only about the stuff with [Kathy].' " Activity Log, p. 119. Kevin "then said he would get into trouble for that and asked if he could be finished now [with the interview]." *Id.*

Additionally, the records that were not disclosed show that the children "were well-coached not to talk" to MCCS and that Mother had ordered Kevin not to talk to hospital personnel who were investigating Mother's physical abuse. *See* High Risk Abuse Confirmation, p. 1. The hospital records state that during the doctor's conversation with Kevin about abuse, "mother entered the room and ordered us all out of the room. She reported that we are the reason her son is the way he is, and then she scolded [Kevin] for talking to us." Doc. #89 (April 15, 2019 DCH Hospital Records, Exam of Dr. Liker, p. 2.

home at Sandhurst Avenue in Dayton, where Curtiss had been living. Spears had heard "rumors" that Curtiss might no longer live there and was able to verify afterwards that Curtiss had moved out six months earlier. Tr. at p. 735 and 742-743.

{¶ 42} During the search, Spears found a hand towel and baby blanket between the box springs and mattress in the master bedroom, and he also found a pink finger dildo in a package with other sexual objects in the closet of the bedroom. *Id.* at p. 748-750. Spears was interested in this latter object, because it could potentially correspond with the three fingers down and one up object that Kathy had described. *Id.*

{¶ 43} During a later interview with Kathy, Spears showed her a number of photographs taken at the house. For a majority of the photos, Kathy was happy and excited to show him the house. However, her demeanor changed when she saw the picture of the hand towel and blanket. At that point, Kathy stopped smiling, nearly got tears in her eyes, froze up, and ran out of the room. *Id.* at p. 752. She also reacted to a photo of the finger dildo, stating that it looked like the blue thing. *Id.* at p. 754. She did not react to photos of any other items that were sexual in nature and were found at the house. *Id.* at p. 764.[10]

{¶ 44} As indicated, Curtiss was indicted on June 20, 2020, on one count of rape and one count of gross sexual imposition, and he was found guilty of the charges. With the above background in mind, we will consider the issue raised, which is whether the

---

[10] In records not disclosed after the in camera inspection, Mother said, during a home visit on March 21, 2019, that "the detective told her that she needs to take [Kathy] to Carehouse so she will disclose what he needs for court." Activity Log, p. 60-61. In addition, during an investigation of Mother's physical abuse, Mother reported that "the children are 'not saying the right things to the therapist' and the detective wants them to be in counseling at Carehouse to help build his case." *Id.* at p. 71.

trial court abused its discretion in failing to disclose various confidential records of the children services agency.

## B. Legal Discussion

{¶ 45} Due to a trial court's broad discretion in admitting evidence, we review whether the court's decision was an abuse of discretion constituting material prejudice. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14. An abuse of discretion "has been described as including a ruling that lacks a 'sound reasoning process.' " *Id.*, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). This is "a deferential review," and "[i]t is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Id.*

{¶ 46} In the case before us, Curtiss filed a motion in July 2020, asking the court to review the MCCS records pertaining to Kevin and Kathy and to disclose them, because the records were relevant and material to his defense. On August 7, 2020, the court ordered MCCS to produce its records for an in camera review. Then, after reviewing the records, the trial court disclosed a limited number of records to counsel and filed them under seal. *See* Court's Ex. II (Sept, 2, 2020). These documents contained some redactions and related solely to the actual sexual abuse investigation that began in October 2018. In its decision, the court reasoned that these records were "relevant and discoverable." *See* Entry Filing Exhibits under Seal (Sept. 2, 2020), p. 1. As indicated,

the 124 documents that the court reviewed were contained on a compact disc that was filed under seal, along with the released records. *See* Court's Ex. I (Sept. 2, 2020).

{¶ 47} These documents included a 157-page "Activity Log." The release date of this log was April 4, 2020, and it included events that occurred between October 13, 2018, and February 2, 2020. *See* Activity Log. Unfortunately, no activity records from dates earlier than October 13, 2018 were contained on this disc.

{¶ 48} As also noted, after the hearing held on November 12, 2020, the State filed a motion asking the court to consider releasing other parts of the MCCS record, because the circumstances of the children's removal could be relevant at trial. Motion for Court to Review In Camera Children Services Records (Nov. 23, 2020), p. 2.

{¶ 49} The court again reviewed records in camera. This time, the court reviewed an MCCS Activity Log with a report date of November 27, 2018. *See* Court's Ex. I, filed under seal on December 2, 2020. The records that were reviewed consisted of pages 30-40 of 278, and they covered activities between May 11, 2017 and August 2, 2017. *Id.* This review was a small part of the total amount of the log, i.e., 278 pages. It is unclear why only this amount of information was provided for review, since the agency's involvement began in January 2017. Specifically, when the State asked the court to review additional parts of the MCCS record, it acknowledged that the reasons for the children's removal could be relevant. However, the pertinent time concerning removal was not just limited to May 11 through August 2, 2017.

{¶ 50} The trial court disclosed all 10 pages it was given to review, but made fairly heavy redactions on some pages. *See* Court's Ex. II (Dec. 17, 2020). Again, the court's reason for disclosing these portions of the record was that they were "relevant and

discoverable." Regarding both sets of records reviewed, the court did not discuss its reasons for rejecting disclosure. From reading the court's brief entries, the only conclusion we can reach is that the court found the remaining records irrelevant.

{¶ 51} We have previously stressed the well-settled principle that "the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the prosecution's good or bad faith." *State v. Cochran*, 2d Dist. Greene No. 2019-CA-41, 2020-Ohio-3054, ¶ 34, citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "Similarly, Crim.R. 16(B)(5) requires the prosecution to disclose '[a]ny evidence favorable to the defendant and material to guilt or punishment.' Hence, *Brady* and Crim.R. 16(B)(5) places [sic] upon the State a duty to disclose evidence 'that is both favorable to the accused and "material either to guilt or to punishment." ' " *Id.*, quoting *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which quotes *Brady* at 87. "The prosecution's duty of disclosure under *Brady* extends to favorable and material evidence that is known to the prosecution and to others acting on the prosecution's behalf in the case." *Id.*, citing *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶ 52} A conflict over disclosure exists when the material in question is confidential. As pertinent here, the law is well-established that "a children services agency's investigatory record resulting from a report of suspected child abuse is confidential." *State ex rel. Clough v. Franklin Cty. Children Servs.*, 144 Ohio St.3d 83, 2015-Ohio-3425, 40 N.E.3d 1132, ¶ 18, citing former R.C. 2151.421(H)(1).[11] Primarily,

---

[11] This provision is now contained in R.C. 2151.421(I)(1).

this section of R.C. 2151.421 provides for confidentiality of these reports in civil actions brought against a person who made the report. R.C. 2151.421(I)(1). This section of the statute also states that "[i]n a criminal proceeding, the report is admissible in evidence in accordance with the Rules of Evidence and is subject to discovery in accordance with the Rules of Criminal Procedure." *Id.* A general provision for confidentiality of agency records is also stated in R.C. 5153.17, which does not list any exemptions.

{¶ 53} In *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), the United States Supreme Court addressed this conflict in a similar situation, i.e., in a case involving disclosure of child abuse investigative files. *Id.* at 43. The court acknowledged that "the public interest in protecting this type of sensitive information is strong," but disagreed that "this interest necessarily prevents disclosure in all circumstances." *Id.* at 57.

{¶ 54} In *Ritchie*, the state statute, like R.C. 2151.421(I)(1), did not absolutely shield disclosure. *Id.* As a result, the court found that information "material" to the defense should be disclosed. *Id.* at 58. The court defined "material" by stating that " '[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id.* at 57, quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

{¶ 55} Although the Supreme Court allowed disclosure of these records, it did not feel the defense should be allowed to make its own search of the files. *Ritchie* at 59. Instead, a fair trial could be ensured by allowing the trial court to examine the files in camera. *Id.* at 60. The court emphasized, however, that while this rule denied a

defendant "the benefits of an 'advocate's eye,' " a trial court's discretion was "not unbounded." *Id.* Specifically, where "a defendant is aware of specific information contained in the file (*e.g.*, the medical report), he is free to request it directly from the court, and argue in favor of its materiality." *Id.* And finally, the court stressed that the disclosure duty was ongoing. In other words, "information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial." *Id.*

{¶ 56} In an opinion concurring with the pertinent part of the court's decision, Justice Blackmun noted that:

> When reviewing confidential records in future cases, trial courts should be particularly aware of the possibility that impeachment evidence of a key prosecution witness could well constitute the sort whose unavailability to the defendant would undermine confidence in the outcome of the trial. As the Court points out, moreover, the trial court's obligation to review the confidential record for material information is ongoing. Impeachment evidence is precisely the type of information that might be deemed to be material only well into the trial, as, for example, after the key witness has testified.

*Id.* at 65–66 (Blackmun, concurring in part and concurring in the judgment.)

{¶ 57} In *Cochran*, we rejected the defendant's claim of error for two reasons. First, the defense had invited the error by failing to ask for an in camera inspection before trial; and second, the defense failed to ask to admit the records or to make a proffer during

trial.   *Cochran*, 2d Dist. Greene No. 2019-CA-41, 2020-Ohio-3054, at ¶ 42-44.   In contrast, here, the defense did file a motion prior to trial and did not waive the issue during trial.   The records were also filed after the in camera inspection and were available.

{¶ 58} In another case, we affirmed the trial court's exclusion of a complaining rape victim's mental health records because they did not impeach her credibility.   *In re J.M.*, 2d Dist. Montgomery No. 22836, 2009-Ohio-3950, ¶ 35.   As examples, we observed, after reviewing the records, that they did not suggest that the victim "had any difficulty with telling the truth or that she had a history of telling lies or making false accusations. Instead, they would have corroborated her own testimony that she had been kicked out of a day-care program for throwing things, hitting people, and fighting."   *Id.*

{¶ 59} In contrast, the records here indicated that Mother (the primary witness) had a history of making inconsistent statements, making apparently false accusations, accusing MCCS caseworkers and hospital employees of lying, threatening lawsuits against both MCCS and hospital personnel, manipulating staff and law enforcement, and triggering others to obtain negative responses that worked on her behalf.   *See* Activity Log, p. 62, 68, 74, 84, 95; High Risk Abuse Confirmation, p. 1; MCCS External Agency Report, p. 2; April 15, 2019 progress notes, p. 1; Mar. 22, 2019 Safety Plan, p. 2.   As indicated, we have no idea what the records between January and May 2017 might have revealed, because the State or its agent, MCCS, did not provide those records to the trial court.

{¶ 60} During trial, the court restricted the defense from questioning Mother about certain reports of violence, stating that Mother was "not on trial" for every act in her life. Tr. at p. 431.   The court further stated that the defense could not "discuss every issue in

a person's life to establish an issue of credibility."  *Id.* at p. 431 and 433.

{¶ 61} While we agree in part with this statement, Mother was a primary prosecution witness, and her credibility and knowledge of events pertaining to violence witnessed by the children was critical to the case.   In fact, during closing, the State relied heavily on Mother's credibility and lack of motivation to lie about the sexual abuse.  *Id.* at p. 883 ("Here's why we believe [Mother]. * * * [Mother] has no motivation to lie about this. * * * She has her kids back.   She got them back already.   So why would she lie about something later?   She has no reason to; she doesn't need to.")

{¶ 62} However, when Mother made the initial accusations, she did not have her children; Curtiss had temporary custody, and even though MCCS intended to return the children in a few months, the agency still retained protective supervision.   Furthermore, even when Mother's later accusations were made, MCCS still retained protective supervision and could have returned to court, as it did later, after violence continued in Mother's home.   And, at that later time, MCCS asked for both protective supervision and temporary custody of the children.   Accordingly, the documents in question were relevant and material and should have been disclosed to the defense.

{¶ 63} " 'Relevant evidence' " means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.   Evid.R. 401.   Under this definition, the MCCS records were relevant.   They were also material under the definition of that term previously discussed in Ritchie.  *See Ritchie*, 480 U.S. at 39, 107 S.Ct. 989, 94 L.Ed.2d 40.   By this, we are not saying that every fact in the records is necessarily true; we make no judgment about that.   The point is that the information

should have been disclosed.

{¶ 64} If the evidence had been disclosed, Mother's testimony may have been disbelieved and material evidence relevant to the defense presented. There is a reasonable probability that the result would have been different. By making this statement, we express no opinion on the eventual outcome; we simply note that the evidence was material and should have been disclosed.

{¶ 65} Furthermore, it is noteworthy that records were not disclosed concerning Detective Spears's comments to Mother about the fact that the children were not disclosing enough and needed to be brought to CARE House to build his case. Either Mother was being truthful about these statements or she was not. If she was not being truthful, that reflects on her credibility. If Mother's statements were true, they could have been used to attack the detective's credibility. In either event, these were material records.

{¶ 66} We also believe the trial court should have reviewed all the records in the Activity Log from the time MCCS case began in January 2017. As indicated, the reasons why the State included only 30 pages of this log are unclear.

{¶ 67} As an additional matter, we agree with the defense that other evidence relating to the level of violence in the home and Kathy's prior behavioral issues was both relevant and material. For example, during closing, the State pointed out that Kathy had regressed in potty training, was acting out sexually, and was in counseling – all of which would have been caused by Curtiss's abuse. Tr. at p. 924-925. However, if other reasons existed for this behavior, they could have cast doubt on what was another important aspect of the State's case.

Accordingly, the first assignment of error is sustained.

## II.   Right to Cross-Examination

**{¶ 68}** Curtiss's second assignment of error states that:

The Trial Court Erred When It Limited Cross-Examination of [Mother]

in Violation of Curtiss' Right to Confront, Due Process and a Fair Trial.

**{¶ 69}** Under this assignment of error, Curtiss argues that the trial court violated his Confrontation Clause rights by restricting his ability to cross-examine Mother on points relevant to his theory of defense.   This theory was based on Curtiss's contention that Mother fabricated the allegations, that Mother coached Kathy, and that Mother had a motivation to lie about the allegations.   Appellant's Brief, p. 12.    The State's position is that the defense was able to show that Mother admitted that she had more than one incident of violence and that additional testimony would have been unnecessarily cumulative.

**{¶ 70}** Under the Sixth Amendment's Confrontation Clause, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."   The United States Supreme Court has "held that this bedrock procedural guarantee applies to both federal and state prosecutions."   *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), citing *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).   Ohio's interpretation of Article I, Section 10 of the Ohio Constitution parallels the federal interpretation, and Ohio's constitution "provides no greater right of confrontation than the Sixth Amendment."   *State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990).   *Accord State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12.

{¶ 71} "The Confrontation Clauses were written into our Constitutions '*to secure for the opponent the opportunity of cross-examination.*' " (Emphasis sic.) *Self* at 76, quoting 5 Wigmore, *Evidence*, Section 1395, at 150 (Chadbourn Rev.1974). "Cross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.' " *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993), quoting *Alford v. United States*, 282 U.S. 687, 691, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931). "The right of cross-examination includes the right to impeach a witness' credibility." *Id*.

{¶ 72} Abuses of discretion involve unreasonable, unconscionable or arbitrary decisions, and include decisions that lack a " 'sound reasoning process.' " *Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, at ¶ 14. Again, this review is deferential, and appellate courts may not simply substitute their judgment for that of trial courts. *Id*.

{¶ 73} As indicated previously, Mother was a significant prosecution witness. We have already discussed Mother's claim of having no prior incidents of violence in her home, other than one. During Mother's cross-examination, the following exchange occurred:

Q. Was the Kettering Police Department involved with your family in January of 2017?

A. I don't recall the police department.

Q. Are you aware that Montgomery County Children Services investigated concerns of physical abuse on January 19, 2017?

A. Yes.

Q. April 18, 2017?

A. Yes.

Q. July 21, 2017.

A. Yeah.

Q. So when you say that there were no other allegations of violence, that wasn't true, was it?

A. I would say not necessarily.

Q. You didn't agree that there was [sic] offenses of violence on those dates?

A. Who are you referring to?

Q. I'm referring to Children's Services being involved on January, April, and July of 2017.

A. For what?

Q. That they were involved with your family for offenses of violence?

A. Against who?

Q. Where there offenses of violence?

A. Against who?

Q. I'm asking you just –

THE COURT: She's asking you to clarify, so I'm going –

* * *

THE COURT: – I'm going to ask you to clarify the question.

MR. GOUNARIS: – Let me ask. I will clarify.

By MR. GOUNARIS:

Q. Who were they referring to?

A. Meaning Children Services?

Q. Yeah.

A. [Kevin]; is that what you're saying?

Q. They were involved there, right?

A. In January, yes.

Q. Okay. Abuse by [D.H.]?

A. No.

Tr. at p. 429-430.

{¶ 74} Shortly thereafter, when defense counsel tried to ask Mother about the allegations of the three dates that involved D.H., the State objected and asked for a sidebar. The trial court agreed to the sidebar, but stated, before hearing any argument on the State's objection, that it intended to sustain it. *Id.* at p. 431. The following exchange then occurred during the sidebar:

THE COURT: She's not on trial, neither is [D.H.]. All right, so –

MR. GOUNARIS: Well, it goes to my defense, Judge.

THE COURT: Which is what?

MR. GOUNARIS: Well, that's what I'm estab – I'm going to tell her

–

THE COURT: No, no, no –

MR. GOUNARIS: She's going to be honest with us or she's not going to be honest.

THE COURT:  And quiet, quiet, okay?  I think it's gone far enough, all right?  And it is beyond, outside of the issue of testing her credibility, so –

MR. GOUNARIS:  Judge?

THE COURT:  Yeah.

MR. GOUNARIS:  Let me add it for the record.  These offenses of violence these children saw –

* * *

MR. GOUNARIS:  – and that's the reason why they –

* * *

MR. GOUNARIS:  – that's why they had to be removed.

THE COURT:  And she's admitted that, so if you just –

MR. GOUNARIS:  It's one time.

THE COURT:  It doesn't – again, I think it's beyond –

MR. GOUNARIS:  Okay.

THE COURT:  what is reasonable.

* * *

THE COURT:  * * * Credibility is limited.  It is – you can't discuss every issue in a person's life to establish an issue of credibility, so just remember that.

Tr. p. 431-433.

{¶ 75} In our view, Mother's testimony needed clarification, and her answers also appeared to have been made with intent to confuse the facts.  We agree that Mother was

not on trial, but the defense should have been able to clarify what Mother said to pursue relevant evidence supporting the defense that coincided with impeachment. We note that in *Green*, defense counsel's cross-examination of a witness was "three times" that of the State and was "tedious and repetitive." *Green*, 66 Ohio St.3d at 147, 609 N.E.2d 1253. Having examined the record, we do not find defense's cross-examination repetitive. In fact, both the State and defense examinations of Mother were similar in length (a total, respectively, of 36 pages and 44 pages, and the latter included three pages devoted to the sidebar discussion).

{¶ 76} We also disagree with the State that the evidence the defense was attempting to elicit was merely cumulative. "Generally, all relevant evidence is admissible in a judicial proceeding." *Smith v. Chatwood*, 2d Dist. Clark No. 2618, 1990 WL 119270, *2 (Aug. 15, 1990), citing Evid.R. 402. However, courts may exclude relevant evidence "if 'its probative value is substantially outweighed by considerations of * * * needless presentation of cumulative evidence.' " *Id.*, citing Evid.R. 403(B). Cumulative evidence " 'is additional evidence of the same kind to the same point.' " *Id.* at *3, quoting *Kroger v. Ryan*, 83 Ohio St. 299, 94 N.E. 428 (1911), syllabus.

{¶ 77} For the reasons discussed, we do not think the evidence the defense attempted to elicit was merely cumulative. As indicated, Mother's testimony was confusing and appeared deliberately obtuse.

{¶ 78} Furthermore, we reject the State's claim that the trial court's ruling on the defense question was prompted by a reference to questions about a guardian ad litem ("GAL") report, which was precluded from being considered. Appellee's Brief, p. 11-12.

{¶ 79} During the sidebar discussion, the trial court twice discussed and rejected

the defense request to ask about the three incidents of violence. *Id.* at p. 431-432. It was only *after* that point that the State asked, "[I]f I can also, before we go further, address the GAL report?" *Id.* at p. 432. When defense counsel then indicated that he had subpoenaed the GAL, the court said it would have to hold a hearing on that point before allowing the GAL to testify. *Id.* at p. 433. This had nothing to do with the defense's attempt to discuss the events of violence, which had already been rejected. The State might have been anticipating that the defense would ask about a GAL report, but that had not occurred. The GAL was also never called to testify.

{¶ 80} The Supreme Court of Ohio has stressed that "the accused has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error. Before constitutional error can be considered harmless, we must be able to 'declare a belief that it was harmless beyond a reasonable doubt.' " *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992), quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 828, 17 L.Ed.2d at 711 (1967). "Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *Id*, citing *State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623, paragraph three of the syllabus (1976), *vacated on other grounds*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

{¶ 81} In view of our prior discussion, we cannot conclude that there is no such reasonable possibility. Again, Mother was a primary, if not the primary, prosecution witness, and the trial court's restriction of cross-examination was not based on sound reasoning. Accordingly, the second assignment of error is sustained.

III.   Right to Confrontation

{¶ 82} Curtiss's third assignment of error states as follows:

The Trial Court Erred When It Admitted a Prejudicial Statement by

[Kathy] in Violation of Curtiss' Right to Confront, Due Process, and a Fair

Trial.

{¶ 83} Curtiss contends that the trial court erred in allowing hearsay testimony about a pink finger dildo that was found during a search of the home of Curtiss's wife. As was previously noted, during forensic questioning, Kathy said that Curtiss had touched her with a "blue thing and the white thing" and said it was "like a stick."   Tr. at p. 656-657. Kathy also described the object as having "three fingers down and one up."   *Id.* at p. 675.

{¶ 84} During the search, the police did not find such an object but did find the pink dildo.   When Det. Spears was questioned, he stated that when he had later shown Kathy a photo of the dildo, she said that "it looks like the blue thing, the one finger up three fingers down."   *Id.* at p. 754.

{¶ 85} Curtiss did not object to this testimony, however.   *See* Tr. at p. 754. Therefore, we review this argument only for plain error.   *See State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 14 (noting that "Confrontation Clause rights, like other constitutional rights, can be waived").   "[P]lain error must be 'obvious' as well as outcome-determinative."   *State v. Sanders*, 92 Ohio St.3d 245, 257, 750 N.E.2d 90 (2001).   "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."   *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 86} As indicated, defendants have a constitutional right to confront witnesses. Consequently, "out-of-court statements violate the Sixth Amendment when they are testimonial and the defendant has had no opportunity to cross-examine the declarant." *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 13, citing *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 87} In deciding "whether a child declarant's statement made in the course of police interrogation is testimonial or nontestimonial, courts should apply the primary-purpose test: 'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, syllabus, quoting and following *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

{¶ 88} Under the circumstances here, Kathy's statement was clearly testimonial, as the primary purpose of showing her the pictures was to prove past events relevant to the police investigation, not to address an ongoing emergency. The forensic interview occurred on October 30, 2018, and the search warrant was executed around five weeks later, on December 6, 2018. Det. Spears did not indicate the precise date on which he showed Kathy the photos, but it would clearly have been after December 6.

{¶ 89} In opposing this assignment of error, the State argues that the Confrontation Clause was not violated because Kathy testified at trial and Curtiss was able to cross-

examine her. We agree. Specifically, "[t]he admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial."  *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64

**{¶ 90}** The State does concede that, even if the Confrontation Clause were satisfied, that would not mean that a hearsay statement was properly admitted.  The State argues, however, that Kathy's statement was admissible as an "excited utterance" under Evid.R. 803(2) because, when Kathy was shown the photo, " 'she blacked out a little bit and then she made a comment about the photo.' "  Appellee's Brief at p. 15, quoting Tr. at p. 753-754.

**{¶ 91}** Under Evid.R. 803(2), an excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  The Supreme Court of Ohio uses the following four-part test to decide if statements should be admitted as excited utterances:

"(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his

actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration."

(Emphasis sic.) *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus, *followed and approved* in *State v. Taylor*, 66 Ohio St.3d 295, 612 N.E.2d 316 (1993), fn. 2.

{¶ 92} Concerning the first prong of the test, "[t]here is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought." (Italics sic.) *Taylor* at 303.

{¶ 93} In *Taylor,* the court noted that a "trend of liberalizing the requirements for an excited utterance when applied to young children who are the victims of sexual assault is also based on the recognition of their limited reflective powers." *Id.* at 304, citing *State v. Wallace*, 37 Ohio St.3d 87, 88, 524 N.E.2d 466 (1988), and *State v. Wagner*, 30 Ohio App.3d 261, 508 N.E.2d 164 (8th Dist.1986). For example, in *Wallace*, the court held that the fact that "fifteen hours passed from the assault to the time of the declarations is not dispositive." *Wallace* at 90. Among the other factors considered was that the child "was unconscious, with intermittent periods of consciousness or semi-consciousness, throughout the fifteen-hour period between the assault and her statements," and that she

made the statement without elicitation on awakening. *Id.* Thus, the statements were admissible as excited utterances.

**{¶ 94}** In *Wagner*, the victim, a three-year-old child, made statements to his mother the morning after being sexually assaulted, and also made statements to a detective several days after the incident. *Wagner* at 262.

**{¶ 95}** Since the startling events in these cases were the sexual assaults, they are significantly different than what occurred here, as the alleged sexual assaults occurred at some point before late July 2018. The statement occurring in December 2018 was several months later. However, here the alleged sexual assaults were not the startling events at issue in applying the hearsay exception.

**{¶ 96}** The startling event stressor in this case regarding Evid.R. 803(2) was Kathy's viewing the photographs. Her reaction was dramatic and immediate. Kathy blacked out a little bit and then made the comment about the photo. We find that the trial court did not abuse its discretion. We find no error. And even if there were error, since our review of this issue is only for plain error, we cannot conclude that exceptional circumstances existed warranting reversal based on a manifest miscarriage of justice.

**{¶ 97}** Based on the preceding discussion, the third assignment of error is overruled.

### V. Admission of Kevin's Forensic Interview

**{¶ 98}** Curtiss's fourth assignment of error states that:

The Trial Court Erred When It Admitted [Kevin's] Forensic Interview in Violation of Curtiss's Right to Confront, Due Process, and a Fair Trial.

{¶ 99} Under this assignment of error, Curtiss argues that the trial court violated his right of confrontation by allowing the jury to see the video-taped forensic interview of Kevin, who did not testify at trial.

{¶ 100} In allowing the jury to see the video over the defense's objection, the trial court first stated that there was no Confrontation Clause issue concerning Kevin because of his age. Tr. at p. 637. The trial court further observed that no Confrontation issue existed because Kevin would not have intended that the video be used in court. *Id.* And finally, the court concluded that a hearsay exception applied due to the State's contention that the video was compiled for purposes of medical diagnosis and treatment. *Id.*

{¶ 101} Although a trial court's hearsay rulings are ordinarily reviewed for abuse of discretion, evidentiary rulings implicating the Confrontation Clause are reviewed de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.2010). *Accord State v. McNeal*, 2d Dist. Montgomery No. 28123, 2019-Ohio-2941, ¶ 31. In de novo review, we independently review a trial court's decision and accord no deference to it. *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997). *See also State v. Azeen*, 163 Ohio St.3d 447, 2021-Ohio-1735, 170 N.E.3d 864; ¶ 59, *State v. Lawson*, 2020-Ohio-3008, 154 N.E.3d 658, ¶ 22 (10th Dist.); and *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 19 (2d Dist.).

{¶ 102} Nonetheless, "[a] constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, citing *Chapman*, 386 U.S. at 24, 87 S.Ct. 824, 17 L.Ed.2d 705. "Whether a Sixth Amendment error was harmless beyond a reasonable

doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.*, citing *Chapman* at 23. (Other citation omitted.)

{¶ 103} In the context of forensic interviews of child sexual abuse victims conducted at child advocacy centers, the Supreme Court of Ohio has noted that "the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim. The interviewer acts as an agent of each member of the multidisciplinary team." *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 33.

{¶ 104} In this case, Jennifer Knisley, a social worker at CARE House, conducted Kevin's forensic interview. At the time, Det. Spears, a member of the interdisciplinary team, was in another room at CARE House, monitoring the interview. Tr. at p. 639, 644, 725, and 729. After the interview, Kevin was referred to Brooke Lowe, a mental health therapist, who was also part of the interdisciplinary team. *Id.* at p. 698, 497, 499, and 520. Knisley, therefore, was Spears's agent and was also Lowe's agent.

{¶ 105} In *Arnold*, the court held that where an interviewer is acting as a police agent, for purposes of eliciting statements that are not related to medical diagnosis, the court must "employ the primary-purpose test to determine whether the primary purpose of the interrogation was ' "to enable police assistance to meet an ongoing emergency." ' " *Id.* at ¶ 35, quoting *Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at paragraph one of the syllabus, quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165

L.Ed.2d 224. The court concluded in *Arnold* that such an emergency was not the primary purpose because "the statements involved a description of past events. The alleged abuse occurred the previous evening, and the questioning specifically attempted to obtain a description of the abuse." *Id.* Additionally, a reasonable person would not conclude that an ongoing emergency existed because the child had been discharged from the hospital the previous evening, and no medical emergency existed at the time of the interview. *Id.* Accordingly, the primary purpose was "to further the state's forensic investigation." *Id.* at ¶ 36. As a result, certain statements the child made "were testimonial in nature and their admission without a prior opportunity for cross-examination [was] prohibited by the Confrontation Clause."

{¶ 106} These statements included the child's "assertion that [the defendant] shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with [him], of [his] boxer shorts, of him removing them, and of what [his] 'pee-pee' looked like; and her statement that [he] removed her underwear." *Id.* at ¶ 34. The court commented that "[t]hese statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation." *Id.*

{¶ 107} The present case is similar to *Arnold*. No ongoing medical emergency existed, as the alleged sexual abuse occurred several months earlier. Even after Det. Spears was informed of the allegations, the forensic interview did not take place for nearly a week. Of statements in the video, a number were not related to diagnosis of Kevin, including the fact that Curtiss's wife was not home when the abuse occurred, that Kathy's clothes were in a basket, that Curtiss and Kathy were in Kathy's bedroom, and that as to

what should happen to Curtiss, Kevin felt the children should be "taken away."  Tr. at p. 691, 694, 694-695, and 696.

{¶ 108} However, some of the statements in the interview were related to medical diagnosis, which includes mental health.  *State v. Turner*, 12th Dist. Brown No. CA2019-05-005, 2020-Ohio-1548, ¶ 38.  The CARE House social worker who conducted the forensic interview indicated that she used Kevin's interview to assess if he needed referrals for medical or mental health evaluation and did refer him for mental health services because witnessing sexual abuse can be considered a trauma.  Tr. at p. 644-645 and 698.

{¶ 109} The statements related to this diagnosis included that Kevin had witnessed Curtiss touching Kathy's "coco" so hard that it bled, that Kathy did not have any clothes on, that Curtiss told him to "get out," that Kathy's face was red while Curtiss touched her, and that while this occurred, Kathy made a sound indicating pain.  *Id.* at p. 690, 693, and 695.

{¶ 110} In view of the fact that some statements were testimonial and therefore improperly admitted, our analysis is whether "there was a reasonable possibility that the evidence complained of may have contributed to the conviction."  *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 78.  The issue is close.

{¶ 111} Curtiss argues that the question about what should happen to him was prejudicial.  Curtiss further notes the State's emphasis on Kevin's testimonial statement in closing that it was reasonable to believe the rape happened because blood was coming from Kathy's coco.  In this context, the State said "We don't just know that because [Mother] saw it.  We also know it because [Kevin] saw it."  Tr. at p. 888.

{¶ 112} In addition, Curtiss notes that the State focused again on inadmissible testimonial evidence by stressing that "[Kevin] also gave you a couple of other pretty key pieces of information. It happens while [T.C., Curtiss's wife] is at work. That's what [Kevin] said." *Id.* And, the State focused on this again, by emphasizing [Kevin's] statement that the crime happened "when [T.C.] was at work." *Id.* at p. 912.

{¶ 113} As to the latter statements, they really did not need verification, because T.C. (a defense witness) testified that before school busing was set up, Curtiss picked Kathy up after school because T.C. was at work. *Id.* at p. 826. Kathy would then just "hang out" with Curtiss "all day or she would go over to Curtiss's mother's house." *Id.* T.C. further indicated that Kathy got off school at around 2:00 p.m., and T.C. got home from work around 4:30 p.m. *Id.* at p. 851.

{¶ 114} The statement about seeing blood coming from Kathy's coco was also not testimonial; it was part of the record pertaining to Kevin's medical diagnosis. In other words, seeing this could have had a psychological effect. As a result, it is not relevant to the analysis.

{¶ 115} Finally, admission of Kevin's statement about wanting to be taken away from Curtiss is somewhat troubling, but we cannot conclude that there was a reasonable possibility that it contributed to Curtiss's conviction. After all, Kevin also stated that he still saw Curtis and "felt real good" about seeing him, because Curtiss had gotten him a new bunk-bed. Tr. at p. 666. Given the other evidence, if accepted, a fact-finder could have reasonably inferred that Kevin would not want to be with Curtiss.

{¶ 116} Based on the preceding discussion, the fourth assignment of error is overruled.

## VI.   Admission of Kathy's Forensic Interview

**{¶ 117}** The fifth and sixth assignments of error are interrelated and will be discussed together.   Curtiss's fifth assignment of error states that:

The Trial Court Erred When It Admitted [Kathy's] Forensic Interview

in Violation of Curtiss' Right to Confront, Due Process, and a Fair Trial.

**{¶ 118}** The sixth assignment of error states that:

The Trial Court Erred When It Found [Kathy] Competent to Testify in

Violation of Curtiss's Right to Confront, Due Process, and a Fair Trial.

**{¶ 119}** Curtiss contends that Kathy was not competent to testify, and as a result, his right of confrontation was violated because he did not have an opportunity to meaningfully cross-examine her.   Curtis further argues that, because Kathy was incompetent to testify, her forensic interview should be analyzed under *Arnold*. According to Curtiss, Kathy's forensic interview also contained numerous statements that were unrelated to her medical diagnosis and treatment.

**{¶ 120}** In response, the State maintains that Kathy was competent to testify and that no issue existed with respect to presenting the forensic interview.   The State further contends that the statements in the interview were related to Kathy's medical diagnosis and treatment and were properly admitted under an exception to the hearsay rule.

**{¶ 121}** The threshold issue, obviously, is whether Kathy was competent to testify. The State originally intended to have the court conduct a hearing under Evid.R. 807, which allows hearsay statements of children under 12 years of age about sexual or physical abuse to be admitted without a decision on the child's competence to testify.

*See State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, 906 N.E.2d 427, syllabus, and Evid.R. 807(A)-(C). However, the State elected not to proceed with the Evid.R. 807 hearing and called Kathy as a witness at trial after the court found she was competent to testify.

{¶ 122} As the parties note in their briefs, Evid.R. 601(A) was amended, effective July 1, 2020, so as to eliminate the prior rule that children under ten years of age are incompetent to testify. Before Evid.R. 601 was amended, "the competency of individuals ten years or older [was] presumed, while the competency of those under ten [had to] be established." *State v. Clark*, 71 Ohio St.3d 466, 469, 644 N.E.2d 331 (1994). Under the prior rule, the party offering the testimony had the burden of establishing "certain indicia of competency." *Id.*

{¶ 123} The test previously used to decide if a child under age ten was competent to testify stated that a trial court must consider: "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *State v. Frazier*, 61 Ohio St.3d 247, 574 N.E.2d 483 (1991), syllabus.

{¶ 124} As currently constituted, Evid.R. 601(B) states that:

A person is disqualified to testify as a witness when the court determines that the person is:

(1) Incapable of expressing himself or herself concerning the matter as to be understood, either directly or through interpretation by one who can

understand him or her; or

(2) Incapable of understanding the duty of a witness to tell the truth.

{¶ 125} While a presumption of incompetency no longer exists and the testimony's proponent no longer has a burden, the *Frazier* factors are still useful in deciding if a child witness is competent to testify. We review a trial court's competency decision for abuse of discretion. *Frazier* at 251. This is because a "trial judge has the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. Thus, the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of receiving just impressions of facts and events and to accurately relate them." *Id.*

{¶ 126} The trial court conducted a competency hearing of Kathy on November 12, 2020, with counsel present. The court did not file a written decision, nor did it indicate on the record that it found Kathy competent to testify. However, this was obviously the court's decision because Kathy was allowed to testify.

{¶ 127} After reviewing the transcript of the competency hearing, we conclude that under either the test in *Frazier* or Evid.R. 601(B), the court did not abuse its discretion in letting Kathy testify. During the hearing, Kathy was able to discuss her schooling and family. Competency Hearing at p. 2-5 and 7. She also demonstrated an awareness of truth and falsity and the responsibility to tell the truth in response to several scenarios that the trial court outlined. *Id.* at p. 6-8.

{¶ 128} The court did not question Kathy about her ability to observe the acts about which she was to testify, but this part of *Frazier* is phrased alternatively, in terms of "the

child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify." *Frazier*, 61 Ohio St.3d 247, 574 N.E.2d 483, at syllabus. The competency transcript indicates that Kathy showed an ability to receive accurate impressions of fact by discussing how she knew the difference between daytime and nighttime. *Id.* at p. 6-7.

{¶ 129} Curtiss notes that courts have taken a child's trial testimony into consideration in evaluating whether a child was competent to testify. Appellant's Brief at p. 24, citing *State v. Conkright*, 6th Dist. Lucas No. L-06-1107, 2007-Ohio-5315. In *Conkright*, the court of appeals held that a child's testimony was improperly admitted because "she did not appear to be able to provide consistent, accurate impressions of what had happened in the past. This was borne out by her inconsistent, contradictory, and brief testimony at trial." *Id.* at ¶ 45. According to Curtiss, Kathy's trial testimony was similarly inconsistent and contradictory.

{¶ 130} In response, the State argues that Kathy's demeanor at trial was more likely a reflection of fear at confronting Curtiss than a sign of incompetence. Appellee's Brief at p. 22.

{¶ 131} In reviewing Kathy's trial testimony, we note that Kathy did initially state that when she lived with Curtiss, nothing happened that made her uncomfortable or hurt her. Tr. at p. 321. She also said she did not remember talking about her coco bleeding and did not remember what she talked about at CARE House. *Id.* at p. 321. However, at the same point in her testimony, Kathy also said that she was a little bit scared to be in court, that she wanted her mother, that she remembered telling her mother about Curtiss making her coco bleed, that it was hard to talk about that day when she was in court, and

that she did not feel good about seeing Curtiss.    *Id*. at p. 322-323 and 325.

{¶ 132} After this discussion, Kathy went on to discuss in some detail what had happened to her.    *Id*. at p. 327-333.    Consequently, her testimony at trial, while inconsistent at times, did not show that she was incompetent.    We therefore find no abuse of discretion in the trial court's competency decision.    This disposes of the sixth assignment of error.    Specifically, "[t]he admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial."    *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64.

{¶ 133} However, pertinent to the fifth assignment of error, hearsay evidence in the forensic video could still have been erroneously admitted (and prejudicial), even if the Confrontation Clause was not violated.    In this situation, the issue would be whether the admission constituted "nonconstitutional error, which 'is harmless if there is substantial other evidence to support the guilty verdict.' "    *Id.*, citing *State v. Webb*, 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994), and Crim.R. 52(A).

{¶ 134} Curtiss argues that statements on Kathy's forensic video interview were impermissible hearsay under *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, because they did not relate to her medical diagnosis and treatment.    Before discussing this point, we note that the trial court limited admission of the video to parts concerning medical diagnosis and treatment.    Tr. at p. 637.    Thereafter, as the State has noted, Curtiss did not object to any specific statements or parts of the video.    Appellee's Brief at p. 20.    Our review, therefore, is only for plain error.

{¶ 135} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth

of the matter asserted." Hearsay is generally inadmissible unless an exception or exclusion applies. Evid.R. 802. As pertinent here, Evid.R. 803 excludes various items from the hearsay rule, "even though the declarant is available as a witness," including "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4).

{¶ 136} "[N]o finding of unavailability is necessary when a statement is admitted pursuant to Evid.R. 803(4), because the rule itself provides that availability of the declarant is immaterial." *State v. Dever*, 64 Ohio St.3d 401, 414, 596 N.E.2d 436 (1992). As a result, the analysis in *Arnold* does not strictly apply, as it centered on whether evidence is "testimonial" or "nontestimonal" for purposes of the Confrontation Clause, where the declarant is unavailable. *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at paragraph one of the syllabus. In contrast to Confrontation Clause requirements, "the test under Evid.R. 803(4) goes solely to whether a statement was made for purposes of medical diagnosis or treatment. If a statement is made for purposes of diagnosis or treatment, it is admissible pursuant to Evid.R. 803(4)." *Id.*

{¶ 137} Traditional considerations for assessing admissibility have included suggestibility of the questioning; a motive to fabricate, like bitter custody proceedings; the child's understanding of the need to tell a physician the truth; the child's age, which could indicate the presence or absence of ability to fabricate; the declarations' consistency; and whether a physician used the proper protocol for interviewing children who have alleged sexual abuse. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944,

¶ 49.

{¶ 138} Nonetheless, in a similar case involving admission of out-of-court forensic videos of children, we noted, after a detailed discussion of existing case law, that *Arnold* and other Confrontation Clause cases are helpful in evaluating whether "out of court statements during [forensic] interviews were properly admitted as an exception to Evid.R. 803(4)." *State v. Remy*, 2018-Ohio-2857, 117 N.E.3d 916, ¶ 54 (2d Dist.), citing *Arnold* and *Ohio v. Clark*, 576 U.S. 237, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306 (2015).

{¶ 139} In *Remy*, as here, the children testified at trial and videos of their forensic interviews were also played to the jury. *Remy* at ¶ 27 and 32. When the defendant claimed error in admitting the videos, the State asserted, as here, that no Confrontation Clause violation existed because the children had testified at trial, and that the videos were properly admitted under the hearsay exception in Evid.R. 803(4). *Id.* at ¶ 33. Also like here, the alleged error was reviewed on a plain error basis because the defendant had failed to object at trial. *Id.*

{¶ 140} Under the circumstances involved in *Remy*, we found that the primary purpose of the children's forensic interviews at the child advocacy center "was for forensic information-gathering, not for the purpose of medical diagnosis and treatment." *Id.* at ¶ 64. We stressed, however, that this did not mean that all the statements in the videos were inadmissible, because some statements may have been made for purposes of treatment. *Id.* We also found that any error in admitting statements unrelated to medical treatment was harmless because the allegations were repeated to other medical professionals, whose testimony the defendant did not challenge. *Id.* at ¶ 65-66. In addition, we found that the testimony's admission was a reasonable trial strategy,

because the defense was attempting to focus on contradictions in the children's statements. *Id.* at ¶ 67-71.

{¶ 141} We have since followed the same approach in other cases. *See State v. Pate*, 2021-Ohio-1838, 173 N.E.3d 567, ¶ 62-73 (2d Dist.), and *State v. Moore*, 2019-Ohio-1671, 135 N.E.3d 1114, ¶ 20-33 (2d Dist.).

{¶ 142} After reviewing the transcript of the video, we find that most of the statements were relevant to medical diagnosis or treatment. These statements, like where Kathy had been touched on her body, that it bled, that Curtiss had done it, and what Curtiss used to touch her, were pertinent to medical treatment. They had also been repeated to therapists and medical professionals. Tr. at p. 396, 402, 448, 507, 509, and 714.

{¶ 143} Some statements were not related to medical diagnosis and treatment, like locations in the house where Curtiss allegedly touched Kathy, whether her clothes were off or on, the appearance of Curtiss's genitals, and that Curtiss hid items with which he had touched Kathy. *See* Tr. at p. 658, 664, and 679. However, the first two statements were primarily extraneous and therefore harmless. Admission of the statement about items being hidden, although not extraneous, was not outcome-determinative and does not require reversal "to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.

{¶ 144} In *Arnold*, the court did say that the child's description of the defendant's genitals was "likely" not necessary for medical diagnosis or treatment. *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 34. In this regard, Curtiss argues that admission of this evidence was critical because Kathy's description in the video, when

she described Curtiss's penis, was that he had an erection. Appellant's Brief at p. 20-21. Specifically, the State had to prove, as part of the elements of gross sexual imposition, that Curtiss's intent in touching Kathy was for purposes of sexual gratification. Curtiss also points out that the State emphasized this part of the video in its closing. *Id.* at p. 21, referring to Tr. at p. 879 and 922.

{¶ 145} In this case, Curtiss was charged with having violated R.C. 2907.05(A)(4) (gross sexual imposition), which states that "No person shall have sexual contact with another, not the spouse of the offender * * * when any of the following applies: * * * The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 146} "The purpose of sexually arousing or gratifying either person is an essential element of R.C. 2907.05(A)(4)." *In re Moore*, 10th Dist. Franklin No. 04AP-581, 2004-Ohio-6357, ¶ 11, citing *State v. Mundy*, 99 Ohio App.3d 275, 292, 650 N.E.2d 502 (2d Dist.1994). "However, there is no requirement that there be direct testimony regarding sexual arousal or gratification." *Id.* Instead, "[t]he trier of fact may infer from the evidence presented at trial whether the purpose of the touching was for the defendant's sexual arousal or gratification." *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 43 (2d Dist.). In this vein, courts have considered the areas of the body being touched as well as the absence of evidence of accidental touching. *Moore* at ¶ 11-13.

{¶ 147} Here, if the evidence presented were believed, there was no need for

direct evidence of sexual arousal or gratification, given the areas of the body touched and the absence of evidence that the touching was accidental. Accordingly, even if the evidence about Curtiss's genitals was improperly admitted, it did not rise to a level of requiring reversal of the gross sexual imposition charge based on a manifest injustice. However, in the event of retrial, that part of the video should not be shown to a jury.

{¶ 148} Accordingly, the fifth and sixth assignments of error are overruled.

VII. Prosecutorial Misconduct

{¶ 149} Curtiss's seventh assignment of error states that:

The State Committed Prosecutorial Misconduct When It Elicited False Testimony from Melissa Lowe in Violation of Curtiss' Right to Due Process and a Fair Trial.

{¶ 150} Curtiss contends that the State committed prosecutorial misconduct when it knowingly allowed its witness, Melissa Lowe, to testify to a false statement. Lowe was the MCCS employee assigned to CARE House who investigated the abuse allegations in October 2018. Tr. at p. 609-619 and 613. According to Curtiss, Lowe's testimony supported one of the State's central themes, which is that MCCS caseworker Lisa Brown was "a villain in this story who ignored a little girl telling her that she was molested by her grandfather." Appellant's Brief at p. 26.

{¶ 151} In response, the State first claims that Curtiss is actually attempting to argue collusion rather than prosecutorial misconduct. The State's contention here is that because the trial court inspected the MCCS records, Curtis must be implying that the court and prosecutor colluded to present perjured testimony. The State further asserts

that Curtiss's argument should be reviewed only for plain error, because the defense did not object in the trial court. Finally, the State argues that the record in question was limited to refreshing Lowe's recollection and merely showed an "inconsistency" between Lowe's testimony and the report. Appellee's Brief at p. 24.

{¶ 152} Before addressing the issues, we categorically reject the State's claim that Curtiss is suggesting that the trial court colluded with the State to present false testimony. The record in question is a note that Lisa Brown, Mother's caseworker, made on July 31, 2018, about a visit at Mother's home after the initial allegations of abuse were made. Tr. at p. 633-634. This document was not admitted at trial. It was also never reviewed by the trial court as part of the in camera inspection.

{¶ 153} Our review of the records indicates, as we noted before, that the only MCCS activity logs given to the trial court were those for dates between October 30, 2018 and February 2, 2020, and those from May 11, 2017 to August 2, 2017. *Therefore, the trial court could not have known what was part of the July 31, 2018 note in the activity log.* There is also no indication in the record that the State showed this log to the court or to defense counsel during trial. Admittedly, defense counsel could have asked to see it when the State used the log during Lowe's testimony. However, defense counsel had no reason to expect that the State would misrepresent the information being presented.

{¶ 154} The State and Curtiss have both cited the same case in connection with resolution of this assignment of error. In that case, the Supreme Court of Ohio stated that " '[t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001),

quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). (Other citation omitted.). The court further elaborated in *Iacona* that:

> Such a claim is in the nature of an allegation of prosecutorial misconduct, and the burden is on the defendant to show that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."

*Id.*

{¶ 155} During trial, the following exchange occurred during Lowe's testimony:

Q; Can you tell me, do you recall what day Lisa Brown went out and met with [Mother] and saw the kids?

A. I don't remember what date it was. No, I don't. Sorry.

Q. If I showed you the record, would that help you?

A. Yes.

MS. MELNICK: May I approach?

THE COURT: Yes.

A. THE WITNESS: July 31 of 2018.

BY MS. MELNICK: All right. And actually, can you review the next section of that as well before I ask you the next question?

A. Okay.

Q. So if there had been any question left in Lisa Brown's head as to what the allegation was, does Lisa Brown's note indicate that [Kathy] made a statement to her about what Teaven had done to her during that home visit?

A.   [Kathy] and [Kevin] both did.

Tr. at p. 634-635.

{¶ 156} We do not have the record for July 31, 2018, because it was neither offered for admission nor admitted at trial.   As a result, we have no idea precisely what it said. However, for purposes of analysis, we note the following statement in the State's brief:

The State refreshed Lowe's memory with an MCCS activity report that detailed the visit to [Mother's] home on July 31, 2018 that was conducted by the initial caseworker, Lisa Brown.   (Tr. 634)   The State then asked Lowe whether, during that visit, [Kathy] told Brown what Curtiss had done to her.   (Tr. 634)   Lowe testified that [Kathy] and [Kevin] both did." The report, however, stated that only [Kevin] had told Brown what Curtiss had done.

Appellee's Brief at p. 24.

{¶ 157} Contrary to the State's contention, the note in the activity log was not used to refresh Lowe's recollection in general; it was only used to refresh her recollection concerning the exact date that Brown conducted the home visit.

{¶ 158} Furthermore, Lowe was asked to and did review the pertinent section of the note before answering the State's question.   Therefore, both Lowe and counsel for the prosecution should have been aware of the inaccuracy of Lowe's testimony. The statement was not true.

{¶ 159} This conduct is troubling.   According to the State, however, under a plain error standard, the conduct could not have affected the outcome of the trial due to "the two Care House interviews and days of testimony."   *Id.* at p. 25. We agree.

{¶ 160} In that information sheet, Det. Spears discussed an interview he had with Brown, who said that she had visited Mother and the children on July 31, 2018.   *Id.* at p. 3.   According to Spears, Brown said that "[w]hile there, the CW [Kathy] would not talk about anything involving the suspect other than him spanking her.   When the CW was asked about sexual abuse, she would not respond.   [Kevin], however, told her that the suspect Papaw touched [Kathy's] 'cucu.' "   *Id.*

{¶ 161} In light of the above discussion, this assignment of error is overruled under the plain error analysis.   However, in the event of a retrial on remand, the trial court will order disclosure of the July 31, 2018 note in the activity log to Curtiss.

{¶ 162} We also note that Curtiss's brief refers to an email to Lowe in which Lisa Brown specifically stated that she had "interviewed the child and she did not corroborate the mother's claim, however the older brother was obviously coached by mother as when CW entered the door he blurted out that Pa Paw had touched his sister's 'Cew Cew.' " Appellant's Brief at p. 26, quoting from Sealed Court's Ex. II, p.7.   Our copy of the sealed exhibits does not contain such an email.   If it exists, it should also be disclosed to the defense.

{¶ 163} Based on the preceding discussion, the seventh assignment of error is overruled.


VII.   Introduction of Evidence Material to Guilt

{¶ 164} Curtiss's eighth assignment of error states as follows:

The Trial Court Erred by Barring Curtiss from Introducing Evidence

Material to His Guilt in Violation of Curtiss' Right to Due Process and a Fair

Trial.

{¶ 165} Under this assignment of error, Curtiss contends that the trial court erred in refusing to admit evidence of Kathy's other disclosures of sexual abuse. The court's decision was based on Ohio's rape shield law.

{¶ 166} Curtiss argues that the disclosure (of abuse by Curtiss's son, C.J., who was also living in the Curtiss household) was not historical, but was mentioned in the same email as Kathy's first disclosure of abuse. This refers to the July 25, 2018 email from Mother to Lisa Brown, which we quoted earlier, in which Mother told Brown about her visit to Dr. Parks and Kathy's initial disclosures of abuse. Tr. at p. 401-402 and State's Ex. 3. According to Mother's email, Kathy claimed that both Curtiss and C.J. had abused her.[12]

---

[12] Curtiss also mentions an October 12, 2018 report of Kathy's school therapist that Kathy and Laura were sexually abused at their foster home right after removal but before they were placed in Curtiss's home. Appellant's Brief at p. 31, citing Sealed Court's Ex. I. However, while the compact disc in Court's Ex. I (Sept. 2, 2020) contains an October 12, 2018 Case Assessment/Investigation Report authored by Melissa Lowe and an October 13, 2018 Safety Plan Summary, it does not contain the October 12, 2018 therapist's report. It is unclear why the therapist's report was not included with the documents provided to the court for the in camera inspection.

We also note that in a document that was released to the defense, the trial court redacted a statement that Kathy made during an October 30, 2018 Care Clinic Consultation. Specifically, Kathy said that Kevin had touched her by her "coco." *Compare* Ex. I (Sept. 2, 2020), at #92, p. 2 with Ex. II (Sept. 2, 2020), Clinic Care Consultation, p. 2. In this vein, records from Kevin's psychiatric hospitalization at St. Joseph, which were not disclosed, indicate sexual behaviors by Kevin at the hospital in September 2017, before he lived with Curtiss. Court's Ex. I (Sept. 2, 2020), Psychiatric Session Note, 9/12/17, p. 1, and Psychiatric Session Note, 9/26/17, p. 1. Records also not provided to the defense indicate that on March 8, 2019, Mother told MCCS that Kevin had disclosed to his therapist that he had been sexually abused while at St. Joseph's. Court Ex. II (Sept. 2, 2020), Doc. #26, at p. 56. According to Mother, the perpetrator was another child at the facility. *Id.* at p. 57. Previously, on October 30, 2018, Mother told a social worker at DCH that Kevin had been engaging in sexualized behaviors like exposing himself and touching girls' "butts." She also indicated that she believed Curtiss was responsible because he was the only one who was allowed to take Kevin off the grounds

{¶ 167} Curtiss also argues that evidence of another abuser should have been admitted because there was reason to believe that Kathy's problematic behaviors resulted from other abuse, not from him. Curtiss stresses that this evidence should have been allowed despite the rape shield law, as it was not intended to harass Kathy or to make insinuations about her sexual history. Finally, Curtiss contends that the court's handling of this matter let the State proceed in a misleading manner. In this regard, Curtiss notes the State's claim in closing argument that "There is no one else. This is not a case of whodunit." Appellant's Brief at p. 31, quoting from Tr. at p. 876.

{¶ 168} In responding, the State argues that C.J.'s alleged abuse did not happen at the same time, and is, therefore, historical for purposes of the rape shield law. The State further notes that while Curtiss had a constitutional right to present a defense, the ability to impeach does not override the interests protected by the rape shield law. Finally, the State stresses that Curtiss never argued below for disclosure of other abuse to counter the State's closing argument, i.e., the claim in closing that Kathy's advanced sexual knowledge must have been caused by Curtiss's abuse.

{¶ 169} The State's last argument is not persuasive. By the time the State made its closing argument, the evidentiary part of the trial had ended. Moreover, the court had already told the defense that it would not allow evidence of Kathy's other allegations of sexual abuse. Tr. at p. 296-297 and 415.

{¶ 170} Ohio's rape shield law, R.C. 2907.02(D), states, in pertinent part, that:

---

at St. Joseph's. 10/30/18 DCH Care Clinic Sexual Abuse Psychosocial Assessment Report, p. 4 and 6. This part of the record was redacted from the materials given to the defense. *See* Court's Ex. I and II (Sept. 2, 2020).

Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

**{¶ 171}** We review evidentiary decisions on rape shield issues for abuse of discretion. *State v. Graham*, 58 Ohio St.2d 350, 352, 390 N.E.2d 805 (1979).

**{¶ 172}** None of the exceptions to the statute apply here, and on that ground, there was no statutory basis for admitting testimony about other possible sexual abuse of Kathy. In the context of this law, the Supreme Court of Ohio has said that " '[t]he rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process.' " *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 66, quoting *State v. Boggs*, 63 Ohio St.3d 418, 422, 588 N.E.2d 813 (1992). "In determining whether the rape shield law would unconstitutionally infringe on a defendant's rights, a court must 'balance the state interest which the statute is designed to protect against the probative value of the excluded evidence.' " *Id.*, quoting *State v. Gardner*, 59 Ohio St.2d 14, 17, 391 N.E.2d 337 (1979).

**{¶ 173}** There is no question that applying this law may lead to the exclusion of relevant evidence. For example, in this case, the State stressed the lack of any other individual who may have sexually abused Kathy. While no "admissible" evidence

showed the existence of another individual, the State's characterization was somewhat disingenuous in light of the restrictions on evidence. Evidence of other sexual abuse may also have explained Kathy's behavioral issues. Nonetheless, we are bound to apply the law as written, and the exceptions are quite limited.

{¶ 174} In a recent decision, the Supreme Court of Ohio rejected a defendant's argument that he should have been able to present evidence about a victim's prior non-consensual sexual activity. *State v. Jeffries*, 160 Ohio St.3d 300, 2020-Ohio-1539, 156 N.E.3d 859. As here, the defense argued that the rape shield law should not have applied because it was intended to protect victims from being harassed for prior consensual sexual activity – which would not be the case where the victim was not at fault. *Id.* at ¶ 6. Instead of being offered to harass, the defense asserted in Jeffries "that the evidence was necessary for the purpose of establishing D.S.'s 'knowledge of the system' and for potentially rebutting any inference the jury might make that D.S.'s behavioral issues around age nine or ten were the result of sexual abuse by Jeffries." *Id.*

{¶ 175} To resolve the issue, the court reviewed the term "sexual activity," which is defined by R.C. 2907.01 and applies to R.C. 2907.01 through 2907.38. *Id.* at ¶ 17. This obviously includes R.C. 2907.02. Based on R.C. 2907.01's plain language, the court concluded that nothing in the definition of "sexual activity" restricts it only to consensual activity. *Id.* at ¶ 18. Therefore, the rape shield law applies to both prior nonconsensual and consensual activity.

{¶ 176} The *Jeffries* court also specifically considered the defendant's contentions that "the clear purpose of the rape-shield law is limited to preventing 'impermissible attacks on some Victorian-minded theory of promiscuity,' " and that "applying the rape-

shield law to an accuser's nonconsensual sexual activity does nothing to promote the purpose behind the law." *Id.* at ¶ 22. In this regard, the court noted that the interest the law promotes are: "(1) preventing harassment of the victim with probing inquiries into private matters, (2) discouraging 'the tendency in rape cases to try the victim rather than the defendant,' (3) encouraging victims to report sexual assaults without fear of being harassed and traumatized by the process, and (4) 'excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative.' " *Id.* at ¶ 23, quoting *Gardner,* 59 Ohio St.2d at 17-18, 391 N.E.2d 337.

{¶ 177} Consistent with these purposes, questioning victims about prior sexual assaults can be just as invasive and humiliating as questioning them about a current assault. *Id.* at ¶ 24. The court further stressed that prior sexual activity, even nonconsensual, is irrelevant in most cases. *Id.* And finally, the court noted that saying "the purpose of the rape-shield law is not furthered by excluding evidence of an accuser's past sexual abuse is to vastly underestimate the insidiousness of victim blaming." *Id.* at ¶ 25.

{¶ 178} The court did stress, however, that "it is worth reemphasizing that the rape-shield law *does not* apply to prior accusations of sexual assault that involve a fabrication of sexual activity." (Emphasis sic.) *Id.* The court also left for another day the issue of whether the law "is unconstitutional as applied to defendants whose constitutional rights to due process and to confront witnesses are impaired by the inability to provide relevant, probative evidence about an accuser's nonconsensual-sexual-activity history." *Id.* at ¶ 28. The reason for rejecting this issue was that the court had not accepted review of that particular proposition of law. *Id.*

{¶ 179} In a subsequent case involving sexual abuse allegations, a court of appeals noted the holding in *Jeffries*, but went on to consider constitutional principles regarding the use of third-party guilt evidence. *State v. Farthing*, 5th Dist. Fairfield No. 2019 CA 00049, 2020-Ohio-4936, ¶ 18, discussing *Holmes v. South Carolina*, 547 U.S. 319, 326-327, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). The court found no error, however, because the record lacked evidence linking the sexual abuse allegations to others. *Id.* at ¶ 22

{¶ 180} The Supreme Court of Ohio appears to have left open the possibility of "as applied" challenges. This is consistent with prior authority in our district. *E.g.*, *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 59 (2d. Dist.); *State v. Hennis*, 2d Dist. Clark No. 2003-CA-21, 2005-Ohio-51, ¶ 48; and *State v. McNeal*, 2d Dist. Montgomery No. 28123, 2019-Ohio-2941, ¶ 34-57. However, the record here does not permit such a review.

{¶ 181} Specifically, Curtiss did not request a hearing, although he did raise the Confrontation Clause issue in responding to the State's Motion in Limine. *See* Defendant's Objection to State's Motion in Limine (Dec. 3, 2020), p. 3-4. The trial court ruled on the motion in limine and response after trial began but did not give any explanation other than to state that the evidence of other disclosures of sexual abuse did not meet the exception (presumably a reference to R.C. 2907.02(D)). Tr. at p. 296-297. However, as indicated, the record is inadequate for us to rule on this issue.

{¶ 182} Accordingly, for the reasons stated, the eighth assignment of error is overruled.

## IX.   Prosecutorial Misconduct During Closing

{¶ 183} Curtiss's ninth assignment of error states that:

The State Committed Prosecutorial Misconduct During Its Closing

Arguments in Violation of Curtiss' Right to Due Process and a Fair Trial.

{¶ 184} Under this assignment of error, Curtiss contends that the State's remarks during closing were a "naked attempt to appeal to an instinct to punish" and violated the "Golden Rule" by encouraging the jurors to put themselves in the position of both Mother and Kathy.   Appellant's Brief at p. 32-33.

{¶ 185} In response, the State notes that "[o]nly two of the challenged statements are arguably improper."   Appellee's Brief at p. 29.   The State also contends that, because Curtiss failed to object, the plain error rule applies, and plain error did not occur.

{¶ 186} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."   *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).   "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' "   *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 190, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).   To evaluate this issue, the closing argument is reviewed in its entirety.   *E.g., State v. Williams*, 73 Ohio St.3d 153, 169, 652 N.E.2d 721 (1995).

{¶ 187} Furthermore, where a defendant fails to object, any error is waived, other than plain error.   *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 89.   Here, Curtiss failed to object to any of the comments, so our review is for plain error.   This is obviously a difficult standard to meet.   However, simply because a difficult

standard applies on appeal does not mean prosecutors have license to violate standards and then argue on appeal that the remarks are only "arguably improper."

{¶ 188} The principle is well-established that " 'arguments by counsel suggesting to jurors that they place themselves in the position of a party to the cause * * * are usually improper, and reversibly erroneous.' " *State v. Ross*, 2d Dist. Montgomery No. 22958, 2010-Ohio-843, ¶ 126, quoting *State v. Southall*, 5th Dist. Stark No. 2008CA00105, 2009-Ohio-768, ¶ 112. *See also State v. Robinson*, 6th Dist. Lucas No. L-06-1182, 2008-Ohio-3498, ¶ 260 (noting that " 'Golden Rule' arguments are generally prohibited in closing arguments").

{¶ 189} Here, exhorting the jury to place itself in "[Kathy's shoes]" or in Mother's "shoes" was something the prosecutor should have known not to do. Tr. at p. 881 and 884. However, due to the restricted review under the plain error doctrine, we cannot say that this error presents the exceptional circumstance in which reversal is required "to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.

{¶ 190} Similar observations apply to other statements to which no objection was made. The State argues that comments like "You're the only ones who can hold him responsible. [Kathy] has done her part. We're asking you to do yours" are not unduly inflammatory and do not ask the jury to "succumb to public demand." Appellee's Brief at p. 31.

{¶ 191} In *State v. Sampson*, 4 Ohio App.3d 287, 448 N.E.2d 467 (7th Dist.1982), the court found that while a statement by the prosecution that "you're the only members who can punish this individual for his criminal actions," was error, it was not sufficiently

prejudicial to cause reversal. *Id.* at 290-291. Again, even if the prosecutor's remarks here are considered as an effort to have the jury punish Curtiss, they are not grounds for reversal on the basis of plain error. As has been often said, prosecutors have "wide latitude in closing argument * * *." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 149.

{¶ 192} Based on the preceding discussion, the ninth assignment of error is overruled.

X.   Cumulative Error

{¶ 193} Curtiss's tenth assignment of error states:

The Cumulative Nature of the Errors Prejudiced Curtiss and Deprived Him of His Right to a Fair Trial.

{¶ 194} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 195} Because we have already determined that the judgment should be reversed, we need not address this assignment of error. Accordingly, the tenth assignment of error is overruled as moot.

XI.   Conclusion

{¶ 196} Curtiss's first and second assignments of error are sustained, the third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error are overruled, and the tenth assignments of error is overruled as moot. The judgment of conviction therefore is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
J. Joshua Rizzo
Eric G. Eckes
Stephanie F. Kessler
Hon. Mary Katherine Huffman